GALBRAITH; J.
Tbe petition herein was filed seeking construction of the will of Susan M. Sturges, deceased, and to have declared null and void certain items, or the whole, thereof because of alleged vagueness, indefiniteness, uncertainty, that certain parts are impos *569 sible of performance, and that they violate certain established rules of law governing such disposition by will, and it also involves the question of the passing, of after-acquired real estate.
The estate sought to be disposed of by this will amounts to something over $100,000 consisting of both personal and real property.
It appears by record and admission of counsel that all persons named as legatees, devisees and heirs of decedent are properly before the court by service or waiver.
The will, verbatim et literatim, is as follows:
The Last Will and Testament of Susan M. Sturges of 100 W. Bark Ave., Mansfield, Richland Co., Ohio.
IN THE NAME OF THE BENEVOLENT FATHER OF ALL:
I, the said Susan M. Sturges, being of sound and disposing mind, and memory, considering the uncertainty of continuance in life, and desiring to make such disposition of my worldly estate as I deem best, do make, publish and declare, this to be my last will and testament; hereby revoking and annulling any and all former will or wills whatsoever by me made.
FIRST: I desire all my just debts and funeral expenses to be paid, as soon as possible after my decease.
SECOND: I give and bequeath
(1) To Arthur D. S'turges & Wife Nina W. Sturges & each of their children One Thousand Dollars.
(2) To Sarah Meade Sturges Wife of Willis M. Sturges Two Thousand Dollars & to each of their children One Thousand Dollars. The income of One Thousand Dollars given to Sarah Meade S'turges is to be given to Willis M. Sturges.
(3) To each of the children of my brother Eben Perry Sturges One Thousand Dollars.
(4) To Emily McKay Sturges widow of Effingham M. Sturges One Thousand Dollars. To Effingham McKay Sturges son of Effingham M. S'turges Five Hundred Dollars. To Emily McKensie Sturges daughter of Effingham M. Sturges Five Hundred Dollars.
(5) To Julia D. Sturges One Thousand Dollars.
(6) The principal of the amounts given to the parents, are to be kept in tact & at their death revert to their children—
(7) The above bequests are to be paid from the best securities in my estate — stocks bonds &e — -When the securities mature *570 or if for any reason it is found best to sell them, the money shall be reinvested in Gov. Bonds. (U.S.) or first mortgages — The income from these bequests only shall be used or at least for ten years, then the principal if the recipient thinks best — The donor wishes each recipient to consider well before using the principal I wish my executor to pay each of these legacies, out right — and I trust to the honor of the recipient to respect my wishes as stated above.
(8) To the Mayflower'Memorial Congregational Church of Mansfield One Thousand Dollars this One Thousand is in addition to the One Thousand I gave the church some years ago. but have held paying the church annually six (06) per et — Int— ($60.00) The income from all this fund is to be used to keep the original church building in repair—
(9) To the First Congregational Church of Mansfield One Thousand Dollars the income to be used to keep, the church in repair—
(10) To the Frances E. Willard Women’s Christian Temperance Union of Mansfield O. One Thousand Dollars, the income to be used for the promotion of Purity Prohibition. Total abstinance from strong drink & tobacco in all forms in Mansfield O. especially among the young—
(11) To the Ohio Women’s Suffrage Asso — Harriet Taylor Upton Warren 0 — Pres. One Thousand Dollars — income to be used to promote the cause of equal suffrage in Ohio.
(12) To the-Anti Tobacco League of the U. S. One Thousand Dollars income to be used to promote the cause of total abstinance from tobacco in all forms, to prevent advertisements of tobacco & its cultivation especially in Ohio — ■
(13) To the Peace Soe. of the U. S. Headquarters at Boston One Thousand Dollars. For special work in Ohio—
(14) To the Soe. for the Prevention of Cruelty to Animals Headquarters at Boston (The National Soc.) One Thousand Dollars for work in Ohio
(15) To the National Anti Divorce League — One Thousand Dollars — to be used especially for promoting a universal divorce law for the U. S. I wish my executor to pay the above bequests out-right — b'ut each object named to keep Principal invested in Gov — Bonds or First Mortgages Income only to be used—
(16) To the Home Missionary Soc — The Foreign Missionary Soc (Am — Board) The Church & Parsonage Building Soc — 8— S — & Pub. Soc — College & Ed — Soc—Am—Miss Soc — Especially for the Indians — Colored people & Chinese. All National Soc’s of the Congregational Church Five Hundred Dollars each. *571 These beguests to the Nat. Soc’s of the Congregational Church I wish paid through the Women’s Miss — Soc. of the First Congregational Church Mansfield. 0
I wish bequests to my family connections to be paid first in full — if the assets of my estate do not allow the payment of the above charities in full I wish them paid Pro rata — my W. Park Ave Real Estate I wish left in tack — They must be paid in full or Pro rata from other assets—
(17) To the first Congregational Church of Mansfield Ohio and the Mayflower Memorial Congregation Church of Mansfield Ohio as residuary legatee of my estate — I bequeath the remainder of my estate & all my Real Estate on W. Park Ave Mansfield Ohio — the income to be used for religious & Philanthropic work in Mansfield Ohio — especially among children & young people promoting among them Christian living the Fruit of the Spirit as shown in Galatians Chapter 5 — Verse 22 — total abstinance from strong drink & tobacco in all forms — rules of health, thrift & economy — I wish these two church Pastors with two women & two men from each church (to be elected yearly by the several churches) to constitute a Board — in connection with the pastor & a man & woman (to be elected yearly by each church) from each of the Evangelical Churches of Mansfield this Board to elect five or seven from its membership composed of men & women equally to administer the income from this trust
I wish the Salvation Army to have the same representation as the churches — (i e) the head of the organization in Mansfield & one man & one woman — as member of the Board — I wish only total abstainers from strong drink &, tobacco to be on this Administration Board — or members of the larger or smaller board in any capacity — I do not wish any of this money appropriated to any church. I wish the property belonging to my estate to be kept in good order.
(18) If any of the children, grand children, or great grand children to the number of three of my father Edward Sturges Sr — should desire I wash they should have good house accommodations in the old homestead or some house standing on my property, fronting on W Park Ave — & if they should in the opinion of the Administration Board be objects of charity they shall receive Two Hundred ($200.00) Dollars yearly, in these provisions the nearest of kin to my brothers shall have first choice — I earnestly hope this part of my bequest may not be necessary but consider it a wise provision
(19) My personal wardrobe I wish sent in tack (no part of it to be given away or used in Ohio) to Santee Mission Santee— Nebraska
*572 (20) My household furniture & furnishings my heirs may purchase if they so desire at a low estimate first — then any of my family connections — under the same provisions — Any furniture or furnishings they do not purchase to be given to the furnishing of the Young Men’s Christian Association of Mansfield 0 — as far as they desire — the remainder to the furnishing of the Salvation Army Headquarters in Mansfield or adjoining towns — -I especially direct none of it shall be used in any private house either by gift or purchase
(21) I have made no special bequest to brother Charles M. Sturges or sister Mary D. Sturges as they have abundance
(22) I wish all these bequests to be considered as coming Erom my father & mother Edward Sturges Sr & Mary Mathews Sturges. & my sister Anna L. Sturges—
(23) I wish this writing construed as Mr. Howard B. Dir-lam understands it as he has been my legal advisor—
(24) If possible I wish no appraisement made of my estate especially my personal estate.
(25) I would like this estate closed as speedily as possible. I nominate and appoint Mr. Howard B. Dirlam to be the executor of this will
IN WITNESS WHEREOF, I have hereunto set my hand and seal this seventeen day of June in the year One Thousand Nine Hundred and 5
Susan Mathews Sturges (Seal)
Not only from the legal duty imposed, but because of acquaiutence from boyhood and the highest of respect entertained 'for the deceased, the court would desire to aid in carrying out such disposition of her property as was desired or expressed by the testatrix, when possible, but it must be guided and controlled by rules of law governing construction and testamentary disposition, and for such latter reason, attention is directed — as preliminary — to certain well known and established rules:
“The judgment of a court in expounding a will should be simply declaratory of what is in the instrument.” (20 Ohio, 500.)
“The inquiry is not, what thought did the testator wish to express by the language used, but what thought has he (or she) expressed by the words and sentences used in the will.” (25 O. C. C. [N. 3.], 494.)
“While the purpose of making a will is to express the inten *573 tion of the'testator and the object of construing it is to ascertain that intent, yet this must be gathered from the words she has used. The inquiry is, not what thought did testator wish to express, but what thought has she expressed.” (1 Redfield on Wills, 433.)
‘ ‘ Courts are careful to discover and enforce the testator’s intention, but com not make a new will for the testator, and it therefore follows that they constantly refuse to ascertain the testator’s intention except from the words which he used in his will. * # * Hence the question which the courts have constantly in mind is not what the testator should have meant to do, or rather what words he meant to use, hut, rather ivhat did he by the words which he actually used.” (15 N. P. [N. .S.], 101.)
“It is the duty of the court to determine her intention from the language she has seen fit to use in the will; not to speculate from surrounding circumstances as to what her real intentions might have been.” (23 O. C. C. [N. S.], 357.)
The intention to be sought for is not that which existed in the mind of the testator but that which is expressed in the language of the will.
Attorneys for the parties presented voluminous briefs, and in extended oral argument have presented hundreds of citations.
The court has examined and considered many of such cases and authorities, but, as has been said by the courts of this state:
“Usually so-called precedents are of little value in the construction of a will, for the reason that wills vary so greatly in their terms, and a conclusion as to one may be, usually is, of but little, if any, service in the construction of another.” (15 N. P. [N. S.], 102.)
“Adjudicated cases in which the intention of the testator has been determined give little or no 'aid in arriving at the intention of the testator in another and different will.” (3 O. C. C. [N. S.], 619.)
“Instruments of this character are so unlike in their terms, and the circumstances surrounding testators so unlike in their facts, that the decision of one case is not apt to aid in the determination of subsequent cases.” (44 O. S., 533.)
“It has not been found of late years profitable to frequently report eases involving the construction of wills, the general *574 fact being that scarcely any two instruments of that character present the precise question in dispute.” (72 O. S., 12; 15 O. S., 109; 87 O. S., 357.)
Coming now to the will in question—
The testimony shows this will to be a holograph. It will be noted that testatrix was careless in the matter of punctuation; some punctuation inserted that if a strict following of its rules was made would leave doubtful, or of no affect, the connection of certain words and phrases used; some of the sentences are so run together that it is difficult at first sight to arrive at a satisfactory conclusion as to their meaning or application.
Fortunately, from the standpoint that the will and its bequests must, be sustained in construction of testatrix’s intention if possible, under the rules first above stated, there is sufficient authority to the effect that — mere punctuation, if it renders doubtful or ambiguous the intention of the testatrix, may be disregarded if from other circumstances a reasonable construction of the testatrix’s intention may be arrived at. 2 Elliott on Contracts, Sec. 1534; 6 O. N. P. (N. S.), 381; 25 O. C. C. (N. S.), 492.
It will be noted, in form, that the will — having been drawn on printed blank — contains 'but two “items,” the first the regularly printed provision for the payment of debts and funeral expenses.
Item “second” contains all of the dispositive provisions, and others — twenty in number — which in the foregoing copy of will the court has designated for convenience of reference by separate numbering in parenthesis.
The first seven of such numbering are what might be denominated “relative” bequests; numbers (8) and (9) as “church” bequests; numbers (10) to (15), inclusive, as “charitable” bequests; (16) a “church society” bequest; (17) and (18) the residuary clauses, and an attempt to create a trust that the income from the balance of her property be used for religious and philanthropic work in Mansfield, etc., and also seeking to attach thereto and engraft thereon a superior charge in the nature of q private charity, of uncertain extent and time, for the benefit *575 of certain relatives of testator — “children, grandchildren, or great-grandchildren, to the number of three, of testator’s father,” etc. And such bequests or clauses, in item second, are the ones for which construction is sought and on which question is made as to validity.
Considering these in order — bequest (1):
“To Arthur D. -Sturges & wife Nina W. Sturges & each of their children One Thousand Dollars,”
on question of indefiniteness and • uncertainty as to amount— whether joint or several.
It is suggested that it would appear from the context, and standing alone, that this bequest was of the sum of $1,000 to the legatees collectively or jointly.
But it is also suggested by reference to bequest (2) :
“To Sarah Meade Sturges, wife of Willis M. Sturges, for the use.and benefit of both, Willis M. Sturges and Arthur D. Sturges both living at the time of the execution of the Will and being her, then, only surviving brothers—
it might be assumed that the testatrix would desire to equalize her bequests to such two living brothers. It appears to the court that to take such view and construction would be mere speculation.
So far as the language of the bequest (1) is concerned it would appear from assocation of names and method of phrasing that the bequest to “Arthur D. Sturges & wife Nina W. Sturges” was joint and not several, and that it was the intention of testatrix that such husband and wife should receive $1,000 jointly. This construction is aided by testatrix’s placing of the sign and the word “each” following her naming of husband and wife and before the words “of their children”; so, in-the opinion of the court testatrix gave, by such bequest, to “Arthur D. Sturges & Wife,” jointly, the sum of $1,000; and to their children (and extrinsic evidence shows these are four), each the sum of $1,000, making the total amount of this bequest $5,000.
On the question — of this item — whether the bequest to Arthur D. Sturges and wife was absolute—
*576 Attention is called to clause or paragraph (6) which provided :
“The principal of the amounts given to the parents are to be kept intact, and at their death revert to their children.”
And it is suggested by counsel that “the force and effect of this provision (6) is to cut down or limit the legal effect of paragraph (1), making the bequest one for the use of Arthur D. Sturges and wife during their life, or in trust to Arthur D. Sturges and his wife for life, and at their death to their children; that this may be the proper construction giving effect to both of these provisions; that if these provisions be considered repugnant, then they neutralize each other, or if we disregard the former and accept the latter, we reach out for a conclusion, a trust fund.”
If there was no further reference to this bequest and condition in this will the court might easily construe the intention to be to create a life and a trust estate, for such amount to such parties. But later in paragraph (7) of the will testatrix says:
“The above bequests are to be paid from the best securities in my estate — stocks Bonds &c — When the securities mature or if for any reason it is found best to sell them, the money shall be reinvested in Gov Bonds. (U.S.) or first mortgages — The INCOME from these bequests ONLY SHALL BE USED. OR AT LEAST FOR TEN YEARS, THEN THE PRINCIPAL IF THE RECIPIENT THINKS BEST.
THE' DONOR WISHES EACH RECIPIENT TO CONSIDER WELL BEFORE USING THE PRINCIPAL. 1 WISH MY EXECUTOR TO PAY EACH OF THESE LEGACIES OUTRIGHT — AND 1 TRUST TO THE HONOR OF THE RECIPIENT TO RESPECT MY WISHES AS STATED ABOYE.”
And, again, in paragraph (16):
“I Wish bequests to my family connections TO BE PAID FIRST IN FULL. If the assets of my estate do not allow the payment of the above charities in full I wish them paid Pro rata — etc. ’ ’
*577 (The above capitalization is by the court to draw special attention.)
If the testatrix intended to vest a life estate only, and in trust, for the parents, she created such “parents” trustees for themselves, with authority to use their own judgment and discretion as to compliance with the restrictions and reservations, and as to their use of the principal. She directs payment to them outright by her executor, and she trusts to their honor, as recipients, to carry out her instructions.
Testatrix places it in the power of the recipients to entirely, and immediately, disregard such instructions and no court would have power to correct or prevent such abuse without going contrary to her directions that such bequests should be paid outright to the parties named.
The original bequest paragraph (1) is of an absolute estate in form; the later provision in paragraph (6) purports to reduce it to a life estate.
The ordinary rule of construction is that when two bequests are inconsistent, the latter will prevail if the two can not be so reconciled as to give effect to both.
But the latter paragraphs (6), (7) and part of (16) are so contradictory of effect and vest such discretion in the recipient that in the opinion of the court they in effect destroy themselves and must legally be disregarded and the bequest to Arthur D. Sturges and wife be held to be absolute. (See 40 Cvc., 1607-1610.)
As to bequest (2) :
“To Sarah Meade Sturges wife of Willis M. Sturges two thousand dollars & to each of their children one Thousand dollars. The income of one thousand dollars given to Sarah Meade Sturges is to be given to Willis M. Sturges.”
It is contended by counsel for-plaintiffs that this bequest to the wife is in fact, in effect, $1,000 to Sarah Meade Sturges and $1,000 in trust for her husband — -Willis M. Sturges — from which he was to have the income during life, and that as Willis M. Sturges died before testatrix his $1,000 would lapse, or pass to his heirs under General Code, 10581; and that in either event *578 that this bequest is limited by paragraph (6) to a life or a trust estate as to “parents” as was contended as to Arthur D. Sturges and wife in paragraph (1).
The court can not reconcile this suggestion of construction with the plain language of paragraph (2) and legal rules.
The language used plainly indicates, to the mind of the court that the principal of $2,000 was given to Sarah Meade Sturges absolutely, but that the income from $1,000 thereof was “to be given to Willis M. Sturges. ’ ’
From the language used the court is of the opinion that this income was personal to Willis M. Sturges and had he lived he would have been entitled to the same during his life, that it was a charge upon such portion of the bequest to Sarah Meade Sturges, and it was a trust to such extent, but at his death such trust and charge would have terminated, and that inasmuch as he died before testatrix that the said Sarah Meade Sturges takes such $2,000 absolutely and free from any charge to the heirs of Willis M. Sturges.
As to the effect of paragraph (6) and other provisions of the will — what was said as to its weight on the bequest to Arthur D. Sturges and wife, would apply equally to the bequest to Sarah Meade Sturges, and the court is of the opinion that under paragraph (2) Sarah Meade Sturges takes $2,000 absolutely, and the children of Sarah Meade Sturges and Willis M. Sturges (two in number, as shown by extrinsic evidence) each, are to receive the sum of $1,000.
As to bequest (3) :
“To each of the children of my brother Eben Perry Sturges ox. b thousand dollars.”
Extrinsic evidence shows that Eben Perry Sturges was deceased at.the time this will was made; that he had three children : Effingham M. Sturges, who died August 12, 1903, before the.will was made, Eben Perry Sturges, Jr., who died Feb. 21, 1908, and Louisa Sturges Morrow who is still, living.
The evidence shows that Effingham M. Sturges was survived by a widow and two children — Effingham M. Sturges and Emily *579 McKenzie Sturges, for whom bequests are made in paragraph (4); Eben Perry Sturges, Jr., was survived by a widow and one son, an infant, Edward Quinfey Sturges for whom no provision is made in the will.
It is suggested that the testatrix knew that Effingham McKay Sturges was deceased and making provision for the children of her brother Eben Perry Sturges, she intended to make'provision for only the children of her brother then living, that is to Eben Perry Sturges, Jr. and Louisa Sturges Morrow.
In face of the express language of the bequest and the force and effect of General Code 10581, this suggestion is only based on speculation and can be of no avail, and distribution under this bequest should be, to— Effingham McKay Sturges, $500; Emily McKenzie Sturges, $500; Edward Quinby Sturges, $1,000; Louisa Sturges Morrow, $1,000.
As to bequest (4):
It is suggested that this paragraph is clear and explicit and that no uncertainty arises in its construction, save and except the amount bequeathed to the widow Emily McKay Sturges, one thousand dollars, which would be subject to the provisions of paragraph (6) — a bequest to a parent — a trust and not an absolute estate.
What has already been said as to the weight and effect of paragraph (6) as to the bequests to Arthur D. Sturges and wife and Sarah Meade Sturges, would apply equally to this bequest to Emily McKay Sturges, and it is the holding of the court that Emily McKay Sturges takes the bequest of $1,000 absolutely.
No uncertainty exists as to bequest (5).
Former reference to paragraphs (6) and (7) makes further interpretation thereof unnecessary except to say that under paragraph (7) the executor is to distribute the foregoing bequests in kind and ouright to the legatees named.
At to bequest (8) :
“To the Mayflower Memorial Congregational Church of Mansfield One thousand dollars this one thousand is in addition to the one thousand I gave the church some years ago, but have held paying the church annually six (06) pr ct Int ($60.00) The in *580 come from all this fund is to be used to keep the original church building in repair.”
It is suggested that “the only question arising on this legacy is as to the calculation of the interest, if any, upon the legacy of $.1,000. It appears to be the intent of the testatrix to complete the execution of a gift of $2,000, only $1,000 of which HAD BEEN PAID together with interest of $60 per year on the $1,000 of the gift which the testatrix had withheld.
If these be the facts, then it would appear reasonable that the Mayflower Memorial Congregational Church under the provisions of this bequest is entitled to $1,000, and the interest thereon at six per cent, from the date when testatrix ceased to pay, to be established by the evidence.”
In other words this suggestion by plaintiffs’ counsel is that this bequest should be construed, and it is a fact, that Susan M. Sturges had paid the original gift of $1,000.
From careful reading of the bequest the court is of the opinion 1hat its language does not sustain such suggestion.
To the court’s mind the language of the bequest appears to suggest that $1,000 was given some years ago (perhaps in form of a promise or subscription) but held (actual payment withheld) paying the church annually six per cent, interest ($60.00) thereon.
This was a matter which should have been settled by extrinsic evidence, if possible.
The only person whose testimony was presented on this question was Rev. Dr. D. G. Blair, pastor of such church, who has only been such pastor for the past three years.
He presented memoranda of the church boobs which show that receipt of the $60.00 interest on S. Sturges repair fund commenced in the year 1907, and was paid each year thereafter to and including the year 1916, and that no payments of such interest was made thereafter. He found no church records which would show that the $1,000 of principal for church repair fund had ever been paid and had been unable to get any information that such principal was paid.
Counsel both for plaintiffs and defendants stated they had *581 no information whether the principal of original gift, referred to in the bequest, had been paid.
From the language of the bequest, and this condition of the evidence, it is the holding of the court that by this bequest the testatrix meant to validate the original gift of $1,000, which was withheld and on which she had paid interest, as a debt against her estate, for such amount and for the interest thereon which was unpaid at the time of her death, and to give an additional $1,000 to such church for the same purpose — “the income from all of this fund to be used ('by such church) to keep the original church building in repair; ’ ’ and the executor is directed to pay the second $1,000 under this bequest, and interest on the original bequest from and including the year 1917, and also as a validated debt the principal of the original gift of $1,000 unless he is able to find satisfactory legal proof, or it is admitted by such church, that the principal of such original gift had been paid during the life of testatrix.
No question is made as to paragraph, or bequest (9). It is clear and explicit.
As to bequest (10) :
“To the Frances E. Willard Woman’s Christian Temperance Union of Mansfield, O. one thousand dollars, the income to be used for the promotion of Purity Prohibition, Total Abstinence from strong drink & tobacco in all forms in Mansfield, O. especially among young. ’ ’
In form and purpose a charitable trust.
It was suggested by counsel that the legality of that purpose is questionable. That “it is fundamental that a will must be lawful, that is it must direct a lawful thing to be done.” That “any direction to do an unlawful thing would be void and any funds bequeathed for an unlawful purpose would be void.”
The court can not see where “the promotion of * * * * Prohibition, total abstinence, from strong drink and tobacco in all forms in Mansfield, O. especially among the young” is unlawful; surely the promotion of “purity” is not unlawful, and it is easy for this court to presume, and in fact it knows, from its bnowl *582 edge' of the personnel of this organization, its purpose and accomplishments that it would not seek to exercise this trust in an unlawful way.
It is also suggested that part of this bequest — Prohibition— has been accomplished and the question is asked — do the rest of the purposes fall with that accomplished, and the entire legacy lapse? Prohibition appears to be accomplished in part. Some assert that it is not accomplished and will not be until complete ratification; which if not occurring the fight, at least' in certain of its phases, is still on.
Even if it was admitted that it is fully accomplished, the purposes Of 'this bequest are so associated and the authority for use of income so generally given, to a society of such established purposes that the suggestion as to partial lapse and failure of entire bequest appears to be without substantial foundation.
The purposes of this society, its plan of work, its mode of operation is declared and has been so worked out for years; and, in general, the language of this bequest is sufficiently definite as to its application of income (see 105 Wis., 485), among a number of purposes, that this court has no hestitancy in pronouncing this bequest legally sound and to direct that the executor shall pay the same to such legatee.
As to bequest (11) :
“To the Ohio Woman’s Suffrage Asso. — Harriet Taylor Upton, Warren, 0. — Prs—one thousand dollars — income to be used to promote the cause of equal Suffrage in Ohio.”
It is suggested by counsel: — “This is a charitable trust, but whether legal or illegal the courts of final resort in the United States are divided. The ease of Garrison v. Little, 75 Ill. App., 402, holds such charity to be legal, the purpose in the bequest in that ease being phrased as follows:
“To be used by them (trustees) according to their best judgment for the attainment of Woman’s Suffrage in the United States of America and its territories. ’ ’
“The case of Jackson v. Phillips, 14 Allen (96 Mass.), 539, holds such a trust to be invalid, because it was to the effect that *583 a change should be made in the Constitution before any such efforts could be deemed to be lawful.”
“What an Ohio court has to say on this subject is yet to be announced. ’ ’
“The question is vital and fundamental. Suppose the bequest was to the effect that electors should be limited to property holders, that is freeholders, would any person contend that a bequest for this purpose, when our state Constitution granted the elective franchise to all persons of twenty-one years of age, or all male persons of twenty-one years of age, irrespective of property rights, or the possession of property rights, would be legal? Would a court enforce such a trust against the provisions of the Constitution?
' ‘ Or would the court promote or foster, or protect a fund and trustees, the purpose of which is to negative and neutralize or overthrow one of the fundamental principles of the Constitution ? ’ ’
The court is not unmindful of the fact that his oath of office among other things requires him to support the Constitution of the state of Ohio, and that the Constitution is the fundamental law of the state.
But the court is not of the opinion that this required support would compel courts to blindly accept its existing provisions to such extent as to block, by legal decision or order, legitimate efforts or action for its change or amendment, or to hold invalid bequests of money seeking to aid change or amendment the purpose of which is lawful, and the means for attainment of which were lawful.
There are lawful ways to work the proposed changes in our fundamental law, and it must be assumed that the legatee and trustee named would only operate in a lawful way.
It was also suggested by counsel that woman suffrage has been attained in Ohio, and that the purpose being accomplished, the necessity fo.r its support fails and the legacy lapses.
As to this latter suggestion the court will assume judicial knowledge that at this time legally authorized efforts are being made to have rescinded or nullified the act or amendment to extend the elective franchise to women.
For this reason it can not yet be said to be accomplished fact.
*584 If, as is suggested by counsel, the courts of this state have not spoken on the subject of bequests of this character and what our courts have to say thereon is yet to be answered, this court is prepared to say, and does say, as to this particular bequest and its language, that the testatrix has provided a legal trust for a legal purpose, that the purpose-has not yet been fully attained, that the same should not lapse from the present condition of the object, and that if an association exists as named and of such location, that the amount of this bequest should be distributed thereto.
As to bequest (12) :
“To the Anti Tobacco League of the U. S. one thousand dollars income to be used to promote the cause of total abstinence from tobacco in all forms, to prevent advertisements of tobacco & its cultivation especially in Ohio.”
If this bequest had stopped at the comma, and there was in existence such a league or society as named to whom payment could be made, such bequest would be upheld for the same reasons upon which bequest (10) is upheld; but in attempting to go to an extent of preventing the cultivation of tobacco in Ohio and to prevent advertisements of tobacco in Ohio, testatrix seeks to interfere with industry, trade and commerce and even interstate commerce, in an article which all of the laws of this state and of all other 'states recognize as lawful.
Tobacco, nowhere to the court’s knowledge is a counterband,■ as alcohol, absinthe, opium, cocaine, etc.
To the court’s view the purpose in the provision in bequest (10) and the provision in this bequest are vastly different.
In bequest (10) the purpose appears to be the promotion in a lawful way of changes in the habits of the people so as to bring about abstinance in the use of tobacco; while in this bequest the purpose is of positive interference with trade and commerce recognized everywhere as lawful, and it is therefore against public policy, unlawful and void.
As to bequest (13);
“To the Peace Soc. of the IT. S. Headquarters at Boston- one thousand dollars for special work in Ohio.”
*585 Extrinsic evidence shows that correspondence addressed to the above named legatee was, in absence of a society of such name, delivered to the World Peace Foundation of Boston, Mass. Resulting correspondence, received by counsel, from a judge of the U. S. Circuit Court of Appeals, other federal officers and the mayor of the city of Boston, state that there is no society of such name; that there are, beside the “Foundation” two other “peace” societies in Boston: — “International School of Peace,” and “League for Permanent Peace.”
With no evidence and no knowledge of' the executor that a society exists such as is named in the bequest the same should fail. ■
But there is another ground, why, in the opinion of the court this bequest can not be legally upheld.
The purpose, the testatrix says, is “for special work in Ohio.” What this “special work” is the testatrix does not tell us, nor can the court know, from the will itself, when or how or in what manner the trust must be executed, nor could the court correct any abuses in.the execution of this trust.
For the foregoing reasons said bequest is held to be null and void.
As to bequest (14) :■
“To the Soe. for the Prevention of Cruelty to Animals Headquarters at Boston (the National Soc.) one thousand dollars for work in Ohio.”
. The purpose of this charity is, in the language of the testatrix, “for work in Ohio.”
It will be noted that the word “special” (which occurs in bequest (13) "is omitted, and the phrase runs, “for work in Ohio” general.
While generally speaking, in and of itself, this may appear indefinite, still we may assume that the American Humane Education Society associated with the Massachusetts “Society for the Prevention of Cruelty to Animals, ’ ’ which has headquarters in Boston and is a National Society doing work in many of the states of the Union, including Ohio, as shown by extrinsic evi *586 deuce, is the beneficiary referred to, and as it has a definite purpose and a definite plan of work, recognized by federal law, or if not by federal law, then by laws of the different states of the Union; that we have an Ohio society for the prevention of cruelty to animals, whose purpose, its mode of operation, the plan, the scheme of which is all worked out and fixed by the Legislature of this state, so that whatever apparent indefiniteness may appear in the statement of the purpose of this trust by the testatrix in her will is relieved by the definite statement of the law.
For such reason such bequest is held to be a valid bequest and the executor is directed to make payment thereof to the American Humane Education Society, the associated body of the Massachusetts Society for the Prevention of Cruelty to Animals, headquarters at Boston, Mass, for work in Ohio.
As to bequest (15):
“To the National Anti-Divorce League — one thousand dollars —to be used especially for promoting a universal divorce law for the U. S.”
It was stated by counsel that, with the sources of information at their command, they were unable to identify or locate such a league as the bequest names.
Counsel suggests: “Granting that there is in existence such a league as named, yet from its very title'it would indicate that the main purpose of its existence is to combat the existing state and condition of laws of our various states pertaining to divorce, which would be illegal.
The court can not agree or see merit in this suggestion. The name would not necessarily indicate the object or purpose or rather the means and methods of accomplishment. Such might be perfectly lawful; and the promotion of a universal divorce law, if possible, such as the efforts to have adopted a uniform negotiable instrument act, might be advantageous and commendable and might include some charitable results.
Attention is directed, in argument and brief, to the action and findings of the National Congress on Uniform Divorce Laws, which met in session at Washington, D. C., in February, 1906, as entitled to weight and consideration in this connection.
*587 This Congress was composed of individuals conspicuous in civic life including members of the judiciary of the highest courts in the various states. This Congress arrived at the conclusion, after diligent study, research, and debate,, that if a uniform divorce law could be adopted, it should contain at least six grounds for the severance of the marital ties: Bigamy, adultery, imprisonment for crime, extreme cruelty, wilful desertion, and habitual drunkenness. \
Such Congress stated: — “It is with respect to the. legal grounds of divorce that theological conservation and. social liberalism are in sharpest antagonism. From the scientific point of view divorce in itself is not immoral; on the contrary it is quite probable that drastic legislation is sometimes immoral, * # * The most enlightened judgment of the age heartily approves of the policy of extending the legal causes so as to include offenses other than the one “scriptural” ground.”
Yet a few of the states recognize this scriptural ground as the only basis for absolute divorce, and an examination of the statutory laws on divorce of all the states show a wide divergence of opinion as to various grounds. Such difference as would to the mind of the court cause a majority of lawyers of the United States to doubt the possibility of adoption by all of the states of uniform grounds.
The “National Congress” declared that, “No federal divorce law is feasible.”
.The court is of the opinion that it is not within the power of the federal government under the Constitution, to adopt or enforce “a universal divorce law,” nor would Congress attempt it, and believing that the purpose of this bequest is impossible of performance the same is held null and void.
As to bequest (16)
“To the Home Missionary Soc. — The Foreign Missionary Soc (Am. Board) The Church & Parsonage Building Soc — S. S. & Pub — Soc—■ College & Ed. Soc. Am. Miss. Soc. — especially for the Indians — Colored people & Chinese.
All National Socs. of the Congregational Church five hundred uollars each.
These bequests to the Nat. Socs. of the Congregational Church *588 I wish paid through the Woman’s Miss. Soc. of the First Congregational Church, Mansfield, 0.”
It appears that there are six societies named specifically in this bequest.
Extrinsic evidence indicates that these, so referred to by testatrix, using their proper names in the order referred to in the bequest are:
(1) “The Congregational Home Missionary Society.”
(2) “The American Board of Commissioners for Foreign Missions.”
(3) “The Congregational Church Building Society.”
(4) “The Congregational Sunday School Extension Society.”
(5) “Congregational Educational Society.”
(6) “American Missionary Association.”
And these are all denominated “National Societies.”
It was stated by the pastor of one of the Congregational churches of Mansfield that there are in all, eight “National Societies” of the Congregational Church, two — the Congregational Board of Ministerial Relief, and the Pilgrim Memorial Fund — which are not specifically named in this bequest; but it is the church’s contention that these last two were meant to be, and were in fact, included ¡by testatrix in her benefaction, and that such intention is borne out by the latter part of such bequest, by the words she used therein, “All National Socs. of the Congregational Church five hundred dollars each. These bequests to the Nat. Socs of the Congregational Church I wish paid through, etc.”
(The italicizing of “All” and “the” is by the . court to direct special attention, upon which words special stress is made by such pastor to support the church’s contention.)
Counsel for plaintiffs deny that such was the purpose and intention of testatrix or that the wording referred to supports such contention.
The executor and counsel for defendants is neutral on this proposition.
*589 In the opinion of the court the words last quoted aré only descriptive of the church connection of the “societies” previously named and were not intended to enlarge the number of societies to which he was making bequests, nor to include the last two named as omitted societies and it is the holding of the court that such last two named societies — the Congregational Board of Ministerial Belief and the Pilgrim Memorial Fund — were not meant to and do not participate as legatees under such bequest.
As to bequest (17) and (18) : the latter relating to the subject of the former, they must be considered together — the residuary bequest and attempted trust for “Beligious & Philanthropic work” etc. and the private “relative” provision attached thereto as a superior charge.
These paragraphs and attempted bequests present the most difficult questions for solution; the court has given them many hours of thought and study and has carefully examined the holdings of numerous courts on somewhat similar questions, and has been compelled to arrive at conclusions contrary to its desire to uphold these attempted bequests and trust if possible.
Taking these up in parts as questions present and rules of disposition and construction apply, attention is first directed to the fact that, while the residum, consisting of both real and personal property, is bequeathed to the First Congregational Church and the Mayflower Memorial Congregational Church and “the income is to be used for religious and philanthropic work in Mansfield, Ohio — especially among children and young people,” testatrix says in the latter part of paragraph (17) “I do not wish any of this money (income) appropriated to any church;” and, while the title to the property is vested in such churches they are io have no direct dominion or supervision thereof and they receive no benefit therefrom; they are mere holders of title of — the corpus of the trust with no authority for management, upkeep, repair or disposition.
In the latter part of paragraph (16) testatrix says: — “my W Park Ave Beal Estate (and all she had is on this street) I wish left intact; ’ ’ and in the latter part of paragraph (17) she says:— “I wish the property belonging to my estate to be kept in good order.”
*590 Passing now to the purposes of this attempted trust:
‘ ‘ The income to be used for religious & Philanthropic work in Mansfield Ohio — especially among children & young people promoting among them Christian living the Fruit of the Spirit as shown in Galatians Chapter 5 — Yerse 22 — (and here should be read in such Scripture verse, which is as follows: — But the fruit of the Spirit is love, joy, peace, longsuffering, gentleness, goodness, faith;”) — total abstinance from strong drink & tobacco in all forms — rules of health, thrift & economy.”
In what way the “income” shall be used or applied to accomplish' these purposes the testatrix does not state.
She does not give the churches named, as naked trustees, authority to direct or to use and apply as other funds expended by them for the accomplishment of these very purposes in their plan of work.
Had she given to the churches for their use for the purposes indicated, or vested them with discretion and not attempted to attach a “relative” bequest which would or might destroy such charitable purpose, a court might uphold such bequest, for the churches have a definite plan of work seeking the accomplishment of such purposes.
Although testatrix states that the income is to be used for religious and philanthropic work, she goes further and directs or attempts to direct in what manner this is to be accomplished.
If the purpose is to be carried out, it must be carried out in the manner directed, and not otherwise. In other words testatrix attempts to define what shall constitute “religious and philanthropic work, ’ ’ and we must confine the purpose of the trust to the things enumerated, that is her will, and we can not substitute or deviate.
There is a question whether there would exist a fund to disburse, after the upkeep and possible “relative” charity attached is deducted, to that I will refer later. But, for the purpose of this question, and for argument, granting that there would exist a fund to disburse, and that the proper proportions to the beneficiaries could be ascertained, in what manner is the “income” *591 to be distributed by the ultimate trustees — the “administration board?”
Nowhere in the residuary clause are such trustees given any discretion; any liberty of action, any power to rely upon their own judgment, except to determine in the “relative” bequest whether or not such relatives are objects of charity in which event such administration board is to make them monetary payments of $200 per year from such “income.”
Such trustees are not a body having a fixed work and plan, they are not given authority to devise ways and means for carrying out testatrix’s instructions. Yet, they must expend the fund so as to accomplish or aid in bringing about at least four things:— (1)“ Promoting among them Christian living — the fruit of the spirit as shown, etc.,” (2) “Total abstinance from strong drink & tobacco in all forms,” (3) “rules of health,” (4) “thrift and economy. ’ ’
The last three are physical virtues. The first is purely spiritual. Both are attributes of mind — perceptible, conceivable, yet intangible — nothing concrete — nothing specific — nothing definite.
As suggested by counsel: “If ‘work’ (religious & philanthropic work) means propaganda, then propaganda to effect or bring about the last three purposes is probably conceivable and possibly subject to human execution. We can conceive a propaganda to be devised and executed among the people of Mansfield by teaching, by lecturing, by publication and distribution among the people of Mansfield effecting “total abstinance,” “rules of health,” “thrift & economy.”
But who will attempt to devise and create the limits and boundaries of Christian living producing the “fruit of the “spirit?”
This has not yet been determined for final accomplishment in the nineteen hundred years since Christ walked upon the earth.
Who will attempt to give us the “specifications?”
As was suggested — a will is not for contemplation, it is for execution.
A will is the plan for the builder, the worker, and what builder, what worker, will undertake to execute this purpose without “specifications.”
*592 What builder, what worker, what propagandist will undertake to devise and execute a method or means, fixing its limits and boundaries of expending funds to promote or effect in the people of Mansfield, ‘ ‘ love, ’ ’ “ joy, ” “ peace, ” “ long-suffering, ” “ gentleness,” “goodness,” “faith,” as conceived by Paul.
Paul himself did not attempt it. It demands too much for human ingenuity. Its limits can only be measured by Eternity.
It carries us beyond the earth into spiritual things, purely spiritual, and not subject to human definition, human limitations, human boundaries, human specifications. These specifications, these limitations, these boundaries, these methods and means are not in the Epistle of Paul, and it is evident they are not in the will of Susan M. Sturges.
How can a court execute? How can trustees execute such a purpose without specifications? How can a court be guided in the execution of such a trust ? How can trustees be restrained ? How can a court correct any abuses ?
If some of such purposes were deemed workable, then how is a court to apportion the fund between these purposes: How much to one purpose and how much to the other purpose? When to one purpose and when to the other purpose ? Or, how long to one purpose and when never to the other purpose ?
Again, if the intent of the testatrix is to control, is to govern, then some single way, then some method, must be devised or created whereby all of these purposes at one and the same time may be effected, among the people of Mansfield, “especially among children and young people.”
As the court views it, it can not be done, it is beyond human power. The testatrix did not do it herself in the provisions of her will, and she can not throw it upon the court. The law imposes no such duty upon the court.
The purposes of this bequest being so vague, indefinite and uncertain that, to the mind of the court, they can not be carried out under any directions given by the testatrix, and being impossible of direction and enforcement by a court, the same is for such reasons void.
*593 And there are other reasons why, to the mind of the court, this bequest must be held void.
1st. — The object of the Trust.
Testatrix uses the words: “children & young people” to designate the cestui que trust under her will.
It will be noted that she uses other words which indicate that they are not the only persons who are to receive the benefit of her legacy. The word “especially” is used in referring to the “children & young people.” So that, it would appear beyond question that another, part, class, or division of beneficiaries were to be included within her bounty. This other set must necessarily refer to either middle-aged people or elderly people, or both; hut as to what portion they are to receive is beyond comprehension.
It is not possible for the trustees, or the “board” attempted to be created, to determine what division to make, and here again we recall that the testatrix has not vested discretion in such trustees or such board. (See 5 N. P., 149.)
Evidently the “children & young people” are not to receive all of the proposed benefits; if not, what part? There is an indefinite limitation, so indefinite in fact that it is incapable of construction.
We must distinguish between uncertainty of individuals to be benefited and the class to be benefited; in the former uncertainty is an element in charitable trusts, in the latter certainty is required. (See 11 C. J., 341, Case Note 72.)
‘ ‘ The general rule may be stated that the gift will be held invalid as a -charitable trust unless the beneficiaries are sufficiently designated so that the court may carry the purposes of the testator into effect.” 2 Alexander on Wills, 1655, Note 35 and cases cited.
For the foregoing reason this attempted trust would fail for uncertainty.
2nd. — The subject of the trust.
It is a self-evident proposition that in’ any form of a trust, charitable or otherwise, if the subject-matter of the trust fail *594 or be diminished to a point of little or no value, the trust must fail for want of subject.
It was contended that such is the situation in this case so far as this proposed trust property is concerned.
Extrinsic evidence was offered as to the condition of the real estate in question, buildings old, not modern in appointments, and out of repair, and the court is' personally familiar with such real estate and conditions and has been from boyhood and knows the evidence as to such condition is true.
It was also shown that the income, in the nature of rentals, from the premises named in the will, would under the most favorable circumstances be almost, if not entirely, consumed in the expense of administration, taxes, repair and upkeep, and that there would be no fund, or very little, to distribute for any purpose attempted to be named in the will.
If this be true then the power is lacking to put the trust in operation.
It is stated in 11 C. J., 351:
“Where it is uncertain whether there will be anything in the hands of the trustees to devote to the charitable "purpose, the trust for such purpose is invalid.”
When we further, consider, that “the income” mentioned in paragraph (17) is subject to a possible- reduction by an occupancy of a part or all. of the real estate from which the income is to be derived, and an additional possible deduction of from $200 to $600 by cash payment to certain relatives of testatrix, which is made a superior charge upon such income, and from extrinsic evidence it is apparent that there is at least one such relative qualified and ready to call for the fulfillment of this provision, it would appear to the court that there would be an entire' absence of net income — or perhaps" a" deficit — for the “board” to administer for same, and perhaps many years to come. ■
In Vilce v. Van Anden, 248 Ill., 358, 362, is the following:
“A will provided that, after the death of testator’s widow "arid *595 daughter to whom annuities were given for life, the trustees ‘may give such part or portion’ of the remaining estate ‘as they may think best and proper to any one or more of my brothers or sisters that may stand in need of the same, in the judgment of my said trustees, and the remainder thereof shall be devoted by said trustees, in their discretion, to the ad ancement of the cause of temperance or in aid of one or more manual training schools’ in a certain city. IE eld — the bequest is void for uncertainty, in that it was uncertain that there would be any part of the fund remaining at the death of the annuitants. ”
For the foregoing reasons, in the mind of the court this attempted trust would fail for uncertainty as to subject.
3rd. — Effect of paragraph (18) — effort to engraft a private trust or charity upon the attempted public trust of paragraph (17)—
Without requoting this paragraph, which was set forth in toto previously, it is clearly apparent that testatrix intended to make these provisions a charge upon the bequest in paragraph (17) and to make the private objects to her bounty dependent upon accommodations and funds to be derived out of the subject-matter of her attempted public charity.
There is a very interesting and instructive case bearing upon this subject and charitable trust in general — Kelly v. Nichols, 19, L. R-. .A, 413, but to save further extension of this memoranda reference is made without comment.
The general rule as presented in 11 C. J., 330 is—
“Where charitable purposes are mingled with other purposes, or where the terms used are so broad that they include both charitable and noncharitable purposes, the whole gift fails as a charity for uncertainty. ”
And for the reasons above noted the court is of the opinion that this attempt of testatrix, and her association of disposition— thus engrafting of a bequest for “relatives” which would destroy or consume all or a large part of the “income,” is destructive of the former attempted charitable trust and another reason why the entire, attempted, bequest should be held void.
*596 4th: — Impracticability of attempted method of administration of proposed trust.
In addition to the reasons already given which render invalid such bequest, we come now to the manner or method in which testatrix has attempted to direct the carrying out of her wishes in regard to said trust fund, and the court is of the opinion that the administration of this proposed trust and the expenditure of the income, if there was any to expend and the trust was otherwise legal, is impossible to carry out because the vehicle or vehicles attempted to be constructed for such purpose are impracticable, unworkable and therefore void.
In the first instance, the property or fund is bequeathed to the two churches as it were; however they are not to administer it through their regularly constituted boards of trustees or other officials; so that, in reality the churches, as sitch, have absolutely no control over the property or income thereof; the naming of them as "residuary legatee” has no meaning, and can only be considered as surplusage.
It is not the two churches that testatrix wishes to carry out her plans; it is in her language — "these two church pastors.” The properly constituted authorities of the churches are not named and not even suggested. The court can not see how the conduct of the pastors is in anywise to be controlled or regulated by any other power than their own wishes, whims, and desires. The court could not control nor direct them. They are not the trustees of the property or the fund. Whatever view we may take of the matter the churches, as such, are not to control the trust or distribute the fund, nor are the pastors to do so.
Then testatrix proceeds to create what is termed a "large board, composed of "these two church pastors” with "two women & two men from each church.” Likewise, this "board” is not to administer the trust or disburse the income.
Here we may inquire how this "larger” board is to be selected? Testatrix provides that they are “to be elected yearly by the several churches.”
Wrho is to elect them? The "several churches.”
*597 Does this mean by the regularly constituted officials in said churches or by the full membership thereof, specially called together for that purpose?
What percentage or proportion of the congregation can elect?
What proportion or number shall constitute a quorum for this purpose ?
The will does not specify. The court does not know, it can not say; the best it could do would be only to guess, to add to testatrix’s provisions, to interpolate and supply what is fatally lacking.
This, under the established rules, the court will not and can not do.
If testatrix had created a trustee with discretion, a different situation would be presented; but she has attempted to lay the course and to point the way; we must follow it, if possible, if not possible then we can not substitute a way of our own, a new modus operandi.
But the above named “board” is not to act alone; it is to act “in connection with the pastor and a man and a woman (to be elected yearly by each church) from each of the Evangelical churches of Mansfield. ’ ’
Whether it is meant that this additional group is to be elected by the Congregational churches or by their own churches is uncertain and difficult to determine.
This would require construction and from the language of the bequest if construed could only be by guess.
However, supposing that it is possible to bring into existence this “larger” board. It is only brought into existence for the purpose of giving birth to another board; it is not the “larger” board that is to administer the trust, it is the child, the offspring, to whom is attempted to be given the income for disbursement.
Now, the “larger” board is to be created from what source? From “each of the Evangelical churches of Mansfield.” In view of this command or direction it is necessary that the court, or some authority point out specifically what are and tvhat are not “Evangelical churches.”
Although extrinsic evidence was presented on this question, *598 and as to the definition of Evangelical, and what churches of M'ansfield are or are not “Evangelical,” from the position the court takes generally as to this bequest it is unnecessary for it to adopt a definition or determine what are or are not Evangelical churches.
Suffice to say that no two of the four ministers who testified agreed exactly on these questions.
If these men whose life study and work has always been in lines which should enable them to agree upon these questions, could not do so, and fail to designate and classify how could it be expected that a court should decide unless arbitrarily-'.
If the court should adopt the number of churches practically agreed upon as Evangelical, by two of these ministers, as the only Evangelical churches, we would arrive at an approximate number of persons who would constitute this larger board — we would have something over one hundred persons, an unwieldy bulky, and heterogenous body, with diverse views and opinions, conflicting ideas and theories as to the proper channels for the use of the income granting that any should exist.
And we must remember that it is only those who are “total abstainers from strong drink & tobacco” who are to be “on this administration board — or members of the larger or smaller board in my capacity. ¥e have no means of ascertaining except by personal interview of all the “Evangelical church” people of Mansfield, as to their inclinations in the above regard, bpt we may believe that a fair preponderance are guilty of the latter infraction — the use of tobacco in some form; so it devolves upon the members themselves to remain off the various boards or to be cross-examined by someone as to their propensities to the things prohibited.
These suggestions might appear triflina; and yet are they not of the very essence of testator’s commands and directions?
Can we lightly cast them aside as unworthy of consideration, when she has not only in this paragraph, but throughout her will, indicated her aversion to tobacco, even going so far in paragraph (12) as to attempt to “prevent advertisements of tobacco & its cultivation especially in Ohio.”
*599 So, therefore, if we are to give full effect to the directions, we are left in a sea of doubt as to. the personnel of the various boards; and who is to remove the doubt? Who is to personally investigate and to determine this personnel?
And further, there is no way to enforce or compel the carrying out of testatrix’s mandate as to the election of these bodies; the churches or congregations might or might not comply; it is purely a matter of option; if they failed to comply or act it would not be a case of faihire of trustee, but one of failure to pursue the course laid out by the maker of the will, and of the only course permissible.
The method of selection with its restrictions as set forth by testatrix must be followed out in order to bring into existence this creature.
And if we should assume that it is legally and physically possible to accomplish what has been heretofore indicated we may now proceed to the last and final board in which is to reside the authority “to administer the income from this trust.”
Testatrix directs that this “larger” board is “to elect five or seven from its membership composed of men and women equally.”
Here is presented a mathematical impossibility; impossible to be performed, incapable of execution; the same difficulty as heretofore must present itself in their selection and control: — -How are they to be elected? By what number or proportion of the “larger” board? What quorum? How long are they to serve? What discretion have they ? What guidance can the court give ?
Both counsel and the court have been unable to discover any criterion in the many cases involving charities, or to find one that resembles this case in this regard.
The only effect of the whole attempted trust provision is to hold in abeyance the property left by testatrix; dead property in so far as the heirs at law are concerned; valueless in so far as the income left for charitable purposes is to be considered.
In other words, by this provision, if possible of accomplishment, we have an organization, a vast machinery — of a wheel within a wheel, and again a wheel within a wheel, unrelated, unconnected by any law or' any permanent rule of organization — a complex— *600 a huge complex machinery set in motion to rent real estate — two or possibly three houses, to pay the taxes, to pay the insurance, to pay custodian or care-taker hire, to keep up perpetually the repairs of buildings that are now old and in constant need of repair, in the most expensive (or valuable real estate) portion of the city — and all for 'the modicum of profit, if any, to be distributed for a purpose vague and indefinite, and so uncertain that no court can correct any of the abuses which might arise therefrom.
In the above reference I have quoted freely from the brief of counsel for plaintiff as it contains, in my judgment, such pertinent and coherent reasoning as to be unanswerable.
The conclusions arrived at, generally as to this bequest, seem to the court to be consistent with and fully sustained by I O. S., 161; 24 O. S., 525; 39 O. S., 29; and 9 O. C. C. (N.S.), 353.
Evidence was offered, which is undisputable, that testatrix became the owner of a piece of real estate on Park avenue, West Mansfield, 0., after the execution of her will, and the question was presented whether it passed under the residuary clause or to the heirs.
In view of the holding that this residuary clause, and with it bequest (18) are void, and therefore all of the real estate of testatrix was undisposed of by her will and would pass to her heirs under the laws of descent of Ohio, it is unnecessary to pass upon this question, but it is the court’s opinion, that if bequests (17) and (18) were valid, the language of paragraph (17) is sufficiently broad, under 16 O. C. C., 219 and 6 O. A. R., 275, to include such real estate and that it would pass to the residuary legatees as a part of the proposed trust property.
No question is made as to the remaining paragraphs, or bequests, and they are sufficiently clear that no interpretation or construction is necessary.
It might be suggested that paragraph (21) would not operate against rights of Charles M. Sturges and Mary D. Sturges as heirs.
Also that all undisposed of personal and real estate of decedent will pass to the heirs of Susan M. Sturges. under the laws of descent.
*601 That paragraph (23) vesting construction of will in her former attorney is null and void.
Decree may be prepared construing the will and making findings in accordance with the foregoing opinion and the executor directed to distribute accordingly. Costs to be taxed against the estate of Susan M. Sturges. Exceptions may be noted. If any interested parties desire to appeal the amount of appeal bond is fixed at $500.